UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CLARENCE BAILEY,

Plaintiff,

– against –

THE CITY OF NEW YORK, JOSEPH
TALLARINE, MICHAEL O'KEEFE, and
MICHAEL COLLINS (individually and as
members of the New York City Police
Department), and JOHN DOES #1-10,

Defendants.

**MEMORANDUM & ORDER**

14-CV-2091

**Parties**

Clarence Bailey

The City of New York
Joseph Tallarine
Michael O'Keefe
Michael Collins
John Does #1-10

**Appearances**

Joshua Douglas Kelner
Ronald C. Burke
Kelner & Kelner, Esqs.
140 Broadway, 37th Floor
New York, NY 10005
(212) 425-0700
jkelner@gmail.com
ronaldcburke@aol.com

Alexandra Corsi
Duane G. Blackman
New York City Law Department
Office of the Corporation Council
100 Church Street, Room 3-206
New York, NY 10007
(212) 356-2340
acorsi@law.nyc.gov
dblackma@law.nyc.gov

JACK B. WEINSTEIN, Senior United States District Judge:

## Table of Contents

I.   Introduction ...................................................................................................................... 3

II.  Facts.............................................................................................................................. 4

    A.  Crime ....................................................................................................................... 4

    B.  Investigation ............................................................................................................ 6

    C.  Bailey's Arrest and Interrogation ............................................................................ 8

    D.  Grand Jury Indictment ............................................................................................ 9

    E.  Preparation for Trial ................................................................................................ 9

    F.  Trial........................................................................................................................ 10

    G.  Jury Verdict ........................................................................................................... 11

    H.  Conviction Overturned .......................................................................................... 12

    I.  Witness Recantation .............................................................................................. 12

    J.  District Attorney's Alleged Policy Withholding Disclosure of *Brady* Materials............. 13

III. Summary Judgment Standard....................................................................................... 14

IV.  Section 1983 ................................................................................................................ 15

    A.  Statute ................................................................................................................... 15

    B.  Three-Year Statute of Limitations ........................................................................ 16

        1.  Equitable Tolling ............................................................................................. 16

        2.  Equitable Estoppel ........................................................................................... 17

V.  Law ............................................................................................................................. 18

    A.  Municipal Liability Standard ................................................................................ 18

        1.  Failure to Train, Discipline or Supervise ........................................................ 19

        2.  Widespread Unlawful Practices by Subordinates ........................................... 20

    B.  False Arrest under Fourth Amendment ................................................................. 21

        1.  Statute of Limitations ...................................................................................... 21

        2.  Standard ........................................................................................................... 22

    C.  Denial of Due Process and Right to a Fair Trial under the Fifth, Sixth and Fourteenth Amendments.......................................................................................... 23

        1.  Statute of Limitations ...................................................................................... 23

        2.  Standard ........................................................................................................... 25

    D.  Malicious Prosecution under Fourth Amendment and State Law .................................. 27

        1.  Statute of Limitations ...................................................................................... 27

        2.  Standard ........................................................................................................... 30

    E.  State Law *Respondeat Superior*........................................................................... 34

        1.  Statute of Limitations ...................................................................................... 34

        2.  Standard ........................................................................................................... 35

    F.  Qualified Immunity ............................................................................................... 35

    G.  Notice of Claim Requirement under General Municipal Law........................................ 38

VI.  Application of Facts to Law ........................................................................................ 39

    A.  Municipal Liability................................................................................................ 39

    B.  False Arrest............................................................................................................ 40

    C.  Right to a Fair Trial ............................................................................................... 41

        1.  Accrual Date .................................................................................................... 41

        2.  Merits ............................................................................................................... 42

    D.   Malicious Prosecution under Federal and State Law ...................................................... 43
       1.   Accrual Date ........................................................................................................ 43
       2.   Merits .................................................................................................................. 43
VII. Conclusion................................................................................................................... 47

## I.          Introduction

This case involves charges of serious misconduct by the District Attorney of Kings County and three detectives.  It will be tried by a jury.

On January 14, 2013, after four years of incarceration, Clarence Bailey's conviction for the attempted murder of Terrance Villanueva on May 6, 2007, which resulted in a twenty-year sentence, was reversed by the New York Supreme Court, Appellate Division, Second Department, as against the weight of the evidence.

Freed, Bailey now claims that the detectives and the assistant district attorney ("ADA") assigned to his case committed serious infractions during the course of the criminal investigation and trial by threatening and coaching witnesses, and withholding critical exculpatory information.

Murky details surround the homicide of Luis Ruiz and the attempted homicide of Villanueva:  More than a score of alcohol- and marijuana-intoxicated people—some armed with dangerous weapons—brawled in the darkness of early morning, so reliable witnesses were likely to be unavailable; and the police investigation may have been inadequate, and possibly rigged.  *Cf.* 4 J. Wigmore, Evidence § 2251, at 827 (1923) (dangers of miscarriage of justice when police coerce witnesses and fail to properly investigate).

Bailey argues that he was falsely arrested, denied the right to a fair trial, and maliciously prosecuted by NYPD detectives Joseph Tallarine, Michael O'Keefe, and Michael Collins.  He contends that other unconstitutional acts by ADA Howard Jackson were attributable to the

policies of a former Kings County District Attorney, creating a *Monell* cause of action against the City of New York.

The City's motion for summary judgment with respect to *Monell* liability is denied.

Defendants' motion for summary judgment regarding the false arrest claim is granted. The statute of limitations has run.

Plaintiff's fair trial and malicious prosecution claims withstand summary judgment. The statute of limitations has not yet accrued on these claims.

## II.    Facts

### A.    Crime

Evidence to date, analyzed most favorably for plaintiff, shows the following:  On the evening of May 5, 2007, Bailey, who has a scar running from his forehead to his chin on the right side of his face and, at the time, sported a goatee, went to the Groove Lounge, a bar/club, in Brooklyn, to watch a boxing match.  (Corsi Decl. Ex. A ¶ 18, ECF No. 59-1 ("Compl."); *see also* Bailey 50-h Hr'g Tr. 12:11–13, 12:23–25, 13:9–12, 25:7–26:15, ECF No. 62-1.)  Some thirty patrons were in the club, including Kalieb Miller (a/k/a "Milk and Pie").  (Compl. ¶ 18; Villanueva Grand Jury Test. 7:11–13, ECF No. 63-27.)

Upset by the way people were looking at his jewelry, Miller called his friend Terrance Villanueva (a/k/a "Brick") to come to the club and start a fight.  (*Id*. at ¶¶ 19–21; *see also* Villanueva Grand Jury Test. 7:8–25; Villanueva Dep. 50:16–18, ECF No 63-20.)  Responding to the call, Villanueva and others arrived.  (Bryant V.S. 2–4, ECF No. 63-11; Villanueva Grand Jury Test. 8:17–24.)  Ruiz, the murder victim, was already there.  (Bryant V.S. 3.)  Confusion ensued.  (Villanueva Grand Jury Test. 9:3–10:3.)

Villanueva, who had been drinking and was high—in his words, "fucked up"—arrived at the Groove Lounge accompanied by seven men. (Villanueva Grand Jury Test. 7:6–7, 8:9–15; *see also* Villanueva Dep. 21:20–22:5; Villanueva Aff. ¶ 7, ECF No. 63-24; Corsi Decl. Ex. D 3, 5, ECF No. 59-1 ("Villanueva V.S. Tr.").) After midnight, on May 6, a fight broke out involving about twenty people. (Bailey 50-h Hr'g Tr. 25:9–15, 30:16–18.) Someone cut Bailey's face. (Bailey 50-h Hr'g Tr.12:16–13:8; Mitchell Dep. 199:8–13, ECF No. 63-45.) To deal with the bleeding, Bailey went to the men's restroom with Karieem Mitchell (a/k/a "Squeaky"). (Bailey 50-h Hr'g Tr. 32:18–21, 36:20–21; Mitchell Dep. 66:10–16, 201:4–6.) Bailey was still in the restroom when the fight moved outside. (Compl. ¶ 24; *see also* Bailey 50-h Hr'g Tr. 36:6–7, 36:20–24, 37:25–38:3; Mitchell Dep. 208:14–16.) Villanueva, Ruiz, and others, were pushed out of the club by "bouncers." (Compl. ¶ 24; *see* Villanueva V.S. Tr. 12–13.)

Outside, a man pointed a silver automatic handgun at Villanueva and pulled the trigger. (Villanueva V.S. Tr. 15, 18, 20; Villanueva Grand Jury Test. 11:6–7.) The gun did not fire. (Villanueva V.S. Tr. 16; Villanueva Grand Jury Test. 11:8, 12:4– 8.) Bailey heard gunshots as he was leaving the restroom. (Bailey 50-h Hr'g Tr. 36:22–24.)

Villanueva and Ruiz ran. (Compl. ¶ 25; *see also* Villanueva V.S. Tr. 16.) According to Kenneth Bryant, an eyewitness, Ruiz tripped and fell. (Bryant V.S. 7–9.) As he lay on the sidewalk, a man with a handgun shot Ruiz several times. (*Id*. at 9; *see also* Villanueva Grand Jury Test. 12:20–13:2, 13:10–14:9; Villanueva Dep. 7:14–23.) The shooter left. (*See id*.) Ruiz died before he reached the emergency room. (Complaint Follow-Up Police Reports 7, ECF Nos. 63-13 & 63-14 ("Police Reports").)

Later that day, Bryant informed ADA Jonathan Kaye and defendant detective Tallarine that the person firing the fatal shots was wearing a black hooded sweatshirt and jeans. (Bryant V.S. 8; *see also* Police Reports 21.) Christopher Griffin (a/k/a "Six"), who had been stabbed in the face, shoulder, and both arms during the fight, urinated on Ruiz. (Griffin V.S. 3, 7, ECF No. 63-2; *People v. Bailey*, Indictment No. 6908/07, Tr. 563:10–564:6, ECF No. 63-34 *et seq.* ("Trial Tr."); *see generally* Police Reports.)

**B.      Investigation**

In the early morning hours of May 6, NYPD officers arrived at the club. (Police Reports 4–5.) At the time, Bailey was inside the Groove Lounge. (Bailey 50-h Hr'g Tr. 36:25–37:2, 37:25–38:3; Mitchell Dep. 213:17–214:12.) He was not arrested or questioned. (Bailey 50-h Hr'g Tr. 38:7–13.)

The same day, defendant detective Tallarine was assigned to investigate the Ruiz homicide. (Tallarine Dep. 32:19-21, 53:24–54:3, ECF No. 63-6.) Assisted by defendant detectives O'Keefe and Collins, Tallarine interviewed many persons over the course of several days. (*Id.* at 33:4–7, 35:4–9; Police Reports 36–76.) The three questioned several witnesses who gave them "material" information "that both supported Bailey's alibi and excluded him as a suspect." (Compl. ¶ 31; *see also, e.g.*, Police Reports 8–10, 18, 21, 23–24, 37 (collection of eight witness interviews, none of which note that perpetrator had any facial scarring). They too received a tip through the "Crimestoppers" phone line that two brothers, Claude and Dorian Muller, were responsible for the Ruiz murder. (Police Reports 51–52; O'Keefe Dep. 78:5–17, ECF No. 63-9 (noting that Muller tip called for follow-up investigation).) Theresa Morales and Reneisha Gibson, eyewitnesses at the crime scene who looked at individuals surrounding Ruiz's body as he lay dying, noted that they would be able to identify one or more men involved in the

Ruiz murder. (Police Reports 8, 18.) Tallarine did not speak to either of them and neither was shown a photo lineup. (Tallarine Dep. 189:11–192:24, 197:4–199:6.) Though Tallarine stated that he sought to locate eyewitness Gibson, he admits there is no documentation to this effect. (*Id.* at 207:14–208:23.)

A number of other witnesses who originally provided witness statements to the police, including Crystal Lemon and Joseph Burkes, were never interviewed or shown a photo lineup. (*Id.* at 193:3–206:9.) Though a photo lineup for the Muller brothers was prepared, no documentation reflects that it was ever shown to any eyewitnesses. (Muller Photo Lineup, ECF No. 63-16; *see also* Police Reports 52.)

On May 22, 2007, Tallarine interrogated Griffin, who had known Bailey for over twenty years. (Police Reports 66; Griffin V.S. Tr. 5:11–16, ECF No. 63-2.) After the interrogation, Tallarine displayed a photo array to Griffin. (Police Reports 66.) The array included Bailey's photograph. (*Id.*) Griffin identified Bailey and told Tallarine that Bailey shot Ruiz. (*Id.*) Plaintiff alleges that Griffin made this identification only because Tallarine threatened to have Griffin's parole revoked and to charge him with the Ruiz murder. (Compl. ¶ 34; *see generally* Tallarine Dep. 91:4–96:7, 110:3–111:10, 113:20–114:21, 132:8–148:2, 156:5–157:23; Police Reports 63, 66–68; Griffin Identification Signed by Emmanuel, ECF No. 63-18; Griffin Grand Jury Test. 8:23–10:4, ECF No. 63-28; Villanueva Dep. 12:14–33:13; *see also infra* Part II.D.)

Two days later, on May 24, at approximately 5:30 p.m., detective O'Keefe interrogated Villanueva. (Police Reports 54.) Villanueva told O'Keefe that a man pointed a gun in his face and pulled the trigger during the fight outside the Groove Lounge, but that the gun did not fire. (*Id.*) Villanueva did not provide a detailed description of the man. (*Id.*) He did not say that the man had a large scar on his face, nor that the man was bleeding. (*Id.*) At approximately 7:00

p.m., he was shown a photo array. (*Id.* at 55.) He identified Bailey as the man who pointed the gun at him outside the club. (*Id.*) Villanueva has since recanted his identification of Bailey, claiming that he was the subject of police coercion. *See infra* Part II.I.

At approximately 9:00 p.m., O'Keefe interrogated Villanueva a second time. (Police Reports 56.) Villanueva told O'Keefe that he was very intoxicated on the night of the shooting. (Villanueva V.S. Tr. 2, 22.) He stated that the man with the gun wore a hat and sunglasses. (*Id.* at 13–15.) Villanueva affirmed that the man who pulled a gun on him was "[n]ot at all" injured. (*Id.* at 15.)

Based on the interrogations of Villanueva and Griffin, Tallarine obtained a warrant for Bailey's arrest. (Tallarine Dep. 169:10–171:14, 183:12–15.) Bailey was taken into custody on July 13. (Bailey 50-h Hr'g Tr. 48:15–18; Tallarine Dep. 179:11–13.)

## C. Bailey's Arrest and Interrogation

On July 14, Bailey was brought to the 81st Precinct, where he was questioned without his attorney. (Tallarine Dep. 179:11–13, 183:16–8.) Later that day, without an attorney present, Bailey was placed in a lineup. (Bailey 50-h Hr'g Tr. 50:8–10.) At 10:00 p.m., Villanueva viewed the lineup and identified Bailey as the person who pointed the gun at him. (Police Reports 73.) At 10:10 p.m., Bryant, who had seen the shooter, viewed the lineup but could not identify anyone, including Bailey. (*See supra* Part II.A; July 14, 2007 Lineup Documentation, Bates No. D000137.) Griffin viewed the lineup at 10:15 p.m. and recognized Bailey. (*Id.*) At 11:30 p.m., Bailey was placed under arrest. (Corsi Decl. Ex S, ECF No. 59-3.)

The following day, July 15, a criminal court complaint, charging Bailey with Murder in the Second Degree and two counts of Criminal Possession of a Weapon in the Second Degree,

was filed in the Criminal Court of the City of New York, Kings County. (Corsi Decl. Ex. T, Bates No. D004142, ECF No. 59-3 ("Criminal Compl. and Indictment").)

### D. Grand Jury Indictment

Before the grand jury, Griffin testified that he did not see Bailey shoot Ruiz. (Griffin Grand Jury Test. 9:20–10:23, ECF No. 63-28.) ADA Jackson then instructed Griffin to step outside. (Jackson Dep. 83:20–84:12, ECF Nos. 29 & 30.) Later that day, Griffin returned and testified that he: (i) did, in fact, see Bailey shoot Ruiz; and (ii) lied initially because he was threatened by an unknown person. (*Id.* at 84:13–95:12; Griffin Grand Jury Test. 13:3–14:15.) Villanueva testified that Bailey was the man who had pointed a gun at him. (Villanueva Grand Jury Test. 14:10–15:17.)

On August 17, three months after the Ruiz shooting, Bailey was indicted and charged with Ruiz's murder, the attempted murder of Villanueva, and illegal possession of a handgun. (Criminal Compl. and Indictment, Bates Nos. D004075–4078.)

### E. Preparation for Trial

Approximately three months after the indictment, Bailey's defense attorney served discovery requests on the Kings County District Attorney's Office seeking the names and statements of the individuals who had been interviewed by the police. (Compl. ¶ 47; *see also* Corsi Decl. Ex. U, ECF No. 59-4 ("Discovery Correspondence").) When ADA Jackson replied to the discovery request, on February 22, 2008, he did not produce all relevant witness statements. (Discovery Correspondence.)

On July 29, 2008, a *Wade* hearing was conducted to determine the admissibility of the result of the police identification procedures. (Wade Hr'g Tr., ECF No. 63-33.) During the

hearing, ADA Jackson did not disclose the identities of the individuals who had identified Bailey, nor did he relate how Tallarine had found the witnesses.  (*Id.*)

Ten months later, ADA Jackson announced that he was ready for trial.  (Compl. ¶ 49.)

**F.    Trial**

On January 15, 2009, seven days short of the start of Bailey's trial, Jackson presented several folders of information to Bailey's defense attorney, including witness statements.  (Discovery Correspondence.)  The contact information for the witnesses was redacted.  (Redacted Discovery Documents, ECF No. 63-32.)  The materials turned over on this date included (i) taped statements and grand jury testimony of Bryant, who had seen the shooter, but had not recognized Bailey in the lineup; and (ii) the Crimestoppers tip regarding the Muller brothers.  (Discovery Correspondence.)  Bryant's name was redacted from his lineup report, which noted that he had failed to recognize anyone in the lineup.  (Redacted Discovery Documents 1.)

Bailey's criminal trial started on January 22, 2009.  (Trial Tr. 1)

On January 26, Bailey's defense attorney told the court that there were a number of witnesses he wanted interviewed by an investigator, and that he needed their addresses.  (*Id.* at 163:3–13.)  The next day, Bailey's defense attorney again requested unredacted police reports with the witnesses' contact information.  (*Id.* at 348:9–23.)  The court then ordered ADA Jackson to turn over the requested information.  (*Id*. at 353:11–21.)

On January 29, at trial, Jackson called Villanueva to testify.  (*Id.* at 435:7–9.)  Villanueva refused to cooperate and Jackson had to secure a material witness order compelling Villanueva to appear.  (Corsi Decl. Ex. V 409:13–20 (sealed transcript).)  Before Villanueva took the stand, in an *ex parte* hearing, Jackson disclosed that Villanueva had stated that he could

not actually identify Bailey and that "he was coerced by police detectives" to do so. (Trial Tr. 428:18–429:6) Jackson stated that if Villanueva were cross-examined on his admission that he could not identify Bailey, Villanueva would testify that an unknown person had threatened him and told him not to testify against Bailey. (*Id.* at 430:13–19.) "[B]y providing this information [just] before Villanueva took the stand, Jackson prevented Bailey's attorney from investigating any of this new information." (Compl. ¶ 57; *see also* Trial Tr. 430:20–435:9.)

At trial, Villanueva testified that Bailey pointed a gun at him and pulled the trigger, but that the gun did not fire. (Trial Tr. 456:16–459:19.) Villanueva did not recall Bailey's goatee or the scar running from his forehead to his chin on the right side of his face. (*Id.* at 459:25–460:4.) Villanueva told the jury that he was "fucked up" that night as a result of drinking alcohol and smoking marijuana. (*Id.* at 446:7–447:13, 464:19–24.) During a ten-minute recess taken before Villanueva's cross-examination, Bailey's defense attorney informed the court that he had not received any documents concerning Villanueva. (*Id.* at 506:6–507:1.) The court ordered Jackson to provide the documents. (*Id.* at 507:2–4.) The documents were handed over; Bailey's attorney was provided with a ten minute recess to review them before cross-examining the witness. (*Id.* at 507:14–19.)

Jackson called Tallarine as his last witness. (*Id.* at 552:13–16, 586:13–15.) Bailey's defense attorney did not call any witnesses; Bailey exercised his Fifth Amendment right not to testify. (*Id.* at 586:20.)

### G. Jury Verdict

On February 5, 2009, following two days of deliberations, the jury returned a verdict acquitting Bailey of the murder of Ruiz and possession of a handgun, but convicting him of the

attempted murder of Villanueva.  (*Id.* at 776:7–778:8.)  On March 16, 2009, Bailey was

sentenced to twenty years in prison.  (Compl. ¶ 63.)

### H.    Conviction Overturned

On January 9, 2013, the Appellate Division reversed Bailey's conviction.  *People v.*

*Bailey*, 958 N.Y.S.2d 173 (App. Div. [2d Dep't] 2013).  It found that the jury's verdict was

against the weight of the evidence.  *Id.* at 175.

Because Bailey claims coercion of witnesses as a basis for his claims here, it is

significant that the Appellate Division did not base its decision on coercion as a reason to

question the probative force of Villanueva's testimony.  Instead, it based it on factors that put in

question the identification's reliability.  It wrote:

> "[W]e conclude, first, that in this one-witness identification case,
> an acquittal would not have been unreasonable and, second, that
> the verdict of guilt was indeed against the weight of the evidence.
> This conclusion is based not on any doubt that the complainant
> was testifying truthfully . . . , but on a combination of factors
> negatively affecting the reliability of his identification of the
> defendant as the perpetrator.  First, by the complainant's own
> admission, he was intoxicated from both alcohol and marijuana at
> the time of the incident.  Additionally, the complainant's attention
> was focused on the gun, rather than on the gunman, during this
> brief incident, so the complainant did "not fully" have a good
> opportunity to view the gunman.  Indeed, at trial, the complainant
> did not remember whether the gunman had facial hair, and he also
> admitted that he did not notice any scars on the gunman's face.  A
> detective testified at trial, however, that the defendant had a
> "prominent" scar on his face.  Finally, the lineup identification did
> not take place until more than two months after the incident.
> These factors, in combination, convince us that the verdict of guilt
> was against the weight of the evidence.

*Id.* (internal citations omitted).

### I.    Witness Recantation

Villanueva is now serving a prison sentence of twenty-five years to life for an unrelated

conviction.  (Villanueva Dep. 222:24–223:3.)  On October 16, 2014, he gave a deposition at the

Shawungunk Correctional Facility in connection with the instant civil matter.  (*Id*. at 1:1–3:21.)
He recanted his prior statements to the police and the grand jury, and at Bailey's criminal trial,
testifying that his identification of Bailey was compelled by coercion.  (*Id*. at 12:12–44:16.)

J.    **District Attorney's Alleged Policy Withholding Disclosure of *Brady*
Materials**

Plaintiff alleges that, when Bailey was prosecuted, Charles Hynes, the district attorney
of Kings County, "had an official policy in his office requiring assistant district attorneys to
delay production of vital information to defendants while he was simultaneously supporting a
task force that recommended doing exactly the opposite."  (Compl. ¶ 71; *see also* Trial Tr.
163:3–165:1, 348:9–23, 353:11–21; Discovery Correspondence; Redacted Discovery
Documents; Compl. Ex. B.)  This policy, Bailey asserts, "demonstrated by the actions of
various assistant district attorneys over the last two decades"—including twenty-two reported
cases where assistant district attorneys in Brooklyn delayed turning over exculpatory
evidence—"caused some of the *Brady* violations that [forced] Bailey to spend years in prison
for a crime he did not commit, and exacerbated the *Brady* violations of Tallarine, Collins, and
O'Keefe."  (Compl. ¶¶ 66, 68 & Ex. A.)  District Attorney Hynes allegedly supported this
policy because "he kn[ew] how hard it [would be] for defendants to prove prejudice after the
trial [ended]."  (*Id*. at ¶ 68.)

On April 4, 2009, the New York State Bar Association's Task Force on Wrongful
Convictions released a report finding that government error was involved in fifty-eight percent
of the wrongful conviction cases reviewed, and that late disclosure of *Brady* materials was the
primary government error that needed to be remedied.  (*Id*. at Ex. B 6–9.)  Bailey contends that
the delay in the production of exculpatory material and witness information "made it impossible
for Bailey's attorney to scrutinize Tallarine, Collins, and O'Keefe's shoddy detective work" and

13

"locate the numerous alibi witnesses that would have led the jury to completely exonerate Bailey at trial." (*Id.* at ¶78; *see also supra* Part II.F.)

### III. Summary Judgment Standard

Summary judgment will be granted when it is shown that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) ("Summary judgment is warranted when, after construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact."). A party cannot rely on implausible testimony to create a triable issue of fact. *See, e.g.*, *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991) (acknowledging that it is "well-settled in this circuit" that self-serving affidavits that contradict prior sworn testimony will not defeat a motion for summary judgment (citing cases)).

The non-moving party must provide "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. Evidence offered to demonstrate a genuine dispute regarding a material fact must consist of more than "conclusory allegations, speculation or conjecture." *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996). "No genuine issue [of material fact] exists if, on the basis of all the pleadings, affidavits and other papers on file, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, it appears that the evidence supporting the non-movant's case is so scant that a rational jury could not find in its favor." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996). "If the non-movant fails to come forth with evidence sufficient to

permit a reasonable juror to return a verdict in his or her favor on an essential element of the claim, summary judgment is granted." *Guisto v. Stryker Corp.*, 293 F.R.D. 132, 135 (E.D.N.Y. 2013) (internal quotation marks and citation omitted).

It is axiomatic that courts do not normally weigh evidence or assess credibility on summary judgment. *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (reversing grant of summary judgment against prison inmate who alleged he had been attacked by other inmates on three separate occasions). "These determinations are within the sole province of the jury." *Id. See also Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 146 (2d Cir. 2012) (reversing grant of summary judgment, noting that "[a] jury reviewing the evidence in this record might well conclude that the evidence . . . present[ed] is insufficient to persuade it to find that [plaintiff has a claim, but] [t]hat factual inquiry is not ours to answer"); *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) (reversing grant of summary judgment, stating that "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment").

## IV. Section 1983

### A. Statute

Plaintiff sues under section 1983 of Title 42 of the United States Code. Section 1983 provides a remedy for individuals who have been deprived of their constitutional rights by one or more government employees or government entities. It reads:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983.

In order to maintain an action pursuant to section 1983, a plaintiff must allege two essential elements. First, "[t]he conduct at issue must have been committed by a person acting under color of state law." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (internal quotation marks and citation omitted). Second, the conduct complained of "must have deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Id.* (internal quotation marks and citation omitted). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

### B.      Three-Year Statute of Limitations

Claims under section 1983 are governed by the statute of limitations and tolling rules provided by analogous state law. *Bd. of Regents v. Tomanio*, 446 U.S. 478, 483–492 (1980). In New York, the statute of limitations applicable to section 1983 claims is three years. *Soto v. Brooklyn Corr. Facility*, 80 F.3d 34, 35 (2d Cir. 1996); *see* N.Y. Civ. Prac. L. & R. § 214(5). The statute of limitations accrues "when the plaintiff knows or has reason to know of the injury which is the basis of [the] action." *Ormiston v. Nelson*, 117 F.3d 69, 70 (2d Cir. 1997) (internal quotation marks and citation omitted).

#### 1.      Equitable Tolling

The Court of Appeals for the Second Circuit has held that equitable tolling of the statute of limitations only applies in "rare and exceptional circumstances." *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005). "[A] litigant seeking equitable tolling must establish two elements: '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary

circumstance stood in his way and prevented timely filing." *Bolarinwa v. Williams*, 593 F.3d 226, 231 (2d. Cir. 2010) (quoting *Lawrence v. Florida*, 549 U.S. 327, 336 (2007) (finding that mental illness can serve as a ground for equitable tolling of the one-year period for filing a federal habeas petition)). "[W]hether equitable tolling is warranted in a given situation is a highly case-specific inquiry." *Id*. at 232 (internal quotation marks and citation omitted). "The term 'extraordinary' refers not to the uniqueness of a party's circumstance, but rather to the severity of the obstacle impeding compliance with a limitations period." *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011) (finding that defendant was not required to show due diligence during the time outside the period he sought to have equitably tolled); s*ee also Dillon v. Conway*, 642 F.3d 358, 363 (2d Cir. 2011) ("Instances which justify equitable tolling include a corrections officer's intentional confiscation of a prisoner's petition shortly before the filing deadline[;] . . . a state appellate court's failure to inform a prisoner that his leave to appeal was denied[;] . . . and . . . an attorney's failure to file a habeas petition on behalf of a prisoner, despite explicit directions from the prisoner to do so." (citations omitted)).

### 2. Equitable Estoppel

A defendant may be equitably estopped from asserting the statute of limitations as a defense "in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused [the plaintiff] to delay in bringing his lawsuit." *Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 50 (2d Cir. 1985). "To invoke equitable estoppel, a plaintiff must show that: (1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment." *Buttry v. General Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995) (citing *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 59 (1984)).

"Whether equitable estoppel applies in a given case is ultimately a question of fact." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001) (applying equitable estoppel doctrine).

## V.     Law

### A.     Municipal Liability Standard

A municipality can be found liable under section 1983 only where it causes the constitutional violation at issue. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."). "To hold a city liable under [section] 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements:  (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks and citation omitted).  Section 1983 municipal liability may lie if a plaintiff (1) establishes a municipality's failure to provide adequate training, discipline, or supervision, which rises to the level of deliberate indifference; or (2) demonstrates unlawful practices by subordinates that are so permanent and widespread as to essentially have the force of law.  *See*, *e.g.*, *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012) (explaining that municipal liability exists if unconstitutional actions were taken "pursuant to municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware, or if a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses").

### 1. Failure to Train, Discipline or Supervise

For purposes of determining *Monell* liability, the relationship between the City of New York and district attorneys was explored in *Jones v. City of N.Y.*, 988 F. Supp. 2d 305 (E.D.N.Y. 2013). *Jones* concluded that the City of New York is not responsible for the training policies or practices of the District Attorney regarding prosecutorial conduct, including the failure to train ADAs not to suppress exculpatory evidence in criminal proceedings. *Id.* at 314–316. The City "cannot control or intervene . . . in any way" with training related to the prosecution of criminals. *Id.* at 314. "District attorneys must stand above and separate from any city or county or officers of any local entity in making prosecutorial decisions." *Id.*

But a "long and persistent history of feckless training and discipline practices [by a district attorney] . . . might give rise to municipal liability." *Id.* at 317 (citing *Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 153 n.5 (2d Cir. 1991) (county held liable for long history of negligent disciplinary practices regarding law enforcement personnel, which gave rise to the individual defendants' conduct in promoting malicious prosecution of plaintiffs)).

A decision by a district attorney not to train assistants in their legal duty to avoid violating constitutional rights rises to an official government policy for section 1983 purposes only if the failure to train amounts to "'deliberate indifference to the rights of persons with whom the untrained employees come into contact.'" *Connick v. Thompson*, 131 S. Ct. 1350, 1354 (2011) (citation omitted) (holding that a district attorney's office may not be held liable under section 1983 for failure to train its prosecutors based on a single *Brady* violation).

Three requirements must be met before a district attorney's failure to train or supervise will be considered to amount to deliberate indifference to the constitutional rights of citizens. *Walker v. City of N.Y.*, 974 F.2d 293, 297 (2d Cir. 1992) (finding that plaintiff's allegations of

deliberate indifference by the district attorney regarding failure to train ADAs in their *Brady*

obligations was sufficient to state a claim under section 1983).  The Court of Appeals for the

Second Circuit described these requirements as follows:

> *First*, the plaintiff must show that a [district attorney] knows . . .
> that her employees will confront a given situation. . . .
>
> *Second*, the plaintiff must show that the situation either presents
> the employee with a difficult choice of the sort that training or
> supervision will make less difficult or that there is a history of
> employees mishandling the situation. . . .
>
> Finally, the plaintiff must show that the wrong choice by the
> [district attorney] employee will frequently cause the deprivation
> of a citizen's constitutional rights.

*Id.* at 297–298 (internal quotation marks and citations omitted).  *See also Collins v. City of N.*

*Y.*, 923 F. Supp. 2d 462, 479 (E.D.N.Y. 2013) ("The Mollen Report . . . establishes—at least for

present purposes—that the misconduct underlying this case . . . was sufficiently widespread to

support an inference of deliberate indifference.   An entire section of the Report is devoted to

"Perjury and Falsifying Documents," which is described as 'a serious problem facing the

Department.'  A jury could reasonably infer from that circumstance, if proven, that the

department's policymakers were aware of a serious risk of constitutional violations, and that the

failure to take any action in response to the problem—whether through training or otherwise—

was the result of deliberate indifference.")

## 2. Widespread Unlawful Practices by Subordinates

"[L]ocal government[s] . . . may be sued for constitutional deprivations visited pursuant

to governmental 'custom' even though such a custom has not received formal approval through

the body's official decisionmaking channels."  *Monell*, 436 U.S. at 690–691 (internal citations

omitted).  *See also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("[T]he Court has

long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" (citation omitted)); *Cash v. Cnty. of Erie*, 654 F.3d 324, 344 (2d Cir. 2011) ("Because *any* sexual contact between a guard and a prisoner is absolutely proscribed by New York state law, a reasonable jury could have found that once defendants learned that guards were violating an absolute proscription in any respect, defendants' actions to prevent future violations were so deficient as to manifest deliberate indifference to a risk of the full range of proscribed sexual conduct, including the sexual assault suffered by plaintiff." (emphasis in original)). *See also Collins*, 923 F. Supp. 2d at 478 ("The Court concludes that [the] allegations regarding Hynes's response—or lack thereof—to misconduct [involving *Brady* violations and other prosecutorial misconduct] . . . make plausible [the] theory that Hynes was so deliberately indifferent to the underhanded tactics that his subordinates employed as to effectively encourage them to do so.")

## B.     False Arrest under Fourth Amendment

### 1.     Statute of Limitations

A false arrest claim accrues when an arrestee is bound over by a magistrate or arraigned on charges. *Wallace v. Kato*, 549 U.S. 384, 389 (2007). The Supreme Court explained:

> Reflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held *pursuant to such process*—when, for example, he is bound over by a magistrate or arraigned on charges. . . . Thereafter, unlawful detention forms part of the damages for the "entirely distinct" tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process. If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more. From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process

rather than detention itself.

*Id.* at 389–390 (emphasis in original).

###     2.     Standard

The Fourth Amendment, made applicable to the states by the Fourteenth Amendment, provides:  "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  An arrest made without probable cause violates this Fourth Amendment right.  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

The existence of probable cause to arrest for any criminal offense—even an offense other than the one identified by the arresting officer at the time of arrest—defeats a false arrest Fourth Amendment claim.  *Devenpeck v. Alford*, 543 U.S. 146, 153–155 (2004).  Probable cause exists "when the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'"  *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (citation omitted).  Its existence depends upon the reasonable objective conclusion to be drawn from the facts known to the arresting officer and those working with him or her at the time of the arrest.  *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003).  Probable cause requires an officer to have "'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'"  *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (citation omitted); *Bartels v. Inc. Vill. of Lloyd*, 751 F. Supp. 2d 387, 397 (E.D.N.Y. 2010) (same).  Courts look to the "'totality of the circumstances,'" but remain aware that "'probable cause is a fluid concept—turning on the assessment of probabilities in particular

factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.'" *Panetta*, 460 F.3d at 395 (citation omitted).

Law enforcement officials have probable cause to arrest if they receive credible information from putative victims or eyewitnesses. *See Singer v. Fulton Cnty. Sheriff, et al.*, 63 F.3d 110, 119 (2d Cir. 1995) ("An arresting officer advised of a crime by a person who claims to be the victim . . . has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity"); *Celestin v. City of N.Y.*, 581 F. Supp. 2d 420, 431 (E.D.N.Y. 2008) ("A positive photo identification by an eyewitness is normally sufficient to establish probable cause to arrest" (citing cases)). A court will consider the reliability of the identification, including the corroborating circumstances and whether there was reason to question the veracity of the witness. *See Thompson v. City of N.Y.*, 603 F. Supp. 2d 650, 657 (S.D.N.Y. 2009) (noting that circumstances may exist "where a victim's identification was so unreliable as to not establish probable cause"); *Oliveira v. Mayer*, 23 F.3d 642, 647 (2d Cir. 1994) (finding police officers lacked probable cause to arrest, highlighting that "even if bystander witnesses are considered presumptively reliable, a report of a crime alone will not necessarily establish probable cause" (citing cases)).

### C. Denial of Due Process and Right to a Fair Trial under the Fifth, Sixth and Fourteenth Amendments

#### 1. Statute of Limitations

Favorable termination is not a pre-requisite to the commencement of a fair trial claim. *Keller v. Sobolweski*, 10-CV-5198, 2012 WL 4863228, at *4 (E.D.N.Y. Oct. 12, 2013) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130–31 (2d Cir. 1997)). A claim premised on fabrication of evidence "accrues when the plaintiff learns or should have learned that the evidence was fabricated and such conduct causes the claimant some injury." *Mitchell v.*

*Victoria Home*, 377 F. Supp. 2d 361, 373 (S.D.N.Y. 2005) (concluding that accrual date for

false arrest claim was date of plaintiff's arrest). *See also Orakwue v. City of N.Y.*, No. 11-CV-

6183, 2013 WL 5407211, at *7 n. 6 (E.D.N.Y. Sept. 25, 2013) (same).

With respect to individuals convicted of a crime, the Supreme Court has ruled that:

> when a state prisoner seeks damages in a [section] 1983 suit, the
> district court must consider whether a judgment in favor of the
> plaintiff would necessarily imply the invalidity of his conviction or
> sentence; if it would, the complaint must be dismissed unless the
> plaintiff can demonstrate that the conviction or sentence has
> already been invalidated.

*Heck v. Humphrey*, 512 U.S. 477, 487 (1994). "*Heck* specifies that a prisoner cannot use

[section] 1983 to obtain damages where success *would necessarily* imply the unlawfulness of a

(not previously invalidated) conviction or sentence." *Wilkinson v. Dotson*, 544 U.S. 74, 81

(2005) (emphasis in original). *See also, e.g.*, *Amaker v. Weiner*, 179 F.3d 48, 51–52 (2d Cir.

1999) (*Heck* rule—that a prisoner-plaintiff may not assert a civil damages claim that necessarily

challenges the validity of an outstanding criminal conviction—applied to claim that plaintiff's

right to meaningful court access had been denied by the withholding of exculpatory evidence).

A fair trial claim that would impugn the validity of a conviction must be dismissed. In

*Perez v. Cuomo*, the court wrote:

> A [section] 1983 claim for the violation of the due process right to
> a fair trial is, in essence, a claim for damages attributable to an
> unconstitutional conviction. . . . Since plaintiff's conviction
> remains valid, plaintiff's claim for violation of his right to a fair
> trial is not cognizable under [section] 1983, and must be dismissed.

*Perez v. Cuomo*, 09-CV-1109, 2009 WL 1046137, at *7 (E.D.N.Y. Apr. 20, 2009) (internal

quotation marks and citations omitted). *See also Jasper v. Fourth Court of Appeals*, No. 08-

CV-7472, 2009 WL 1383529, at *1 (S.D.N.Y. May 18, 2009) ("The Court liberally construes

this complaint as asserting that plaintiff was denied his constitutional right to a fair trial.

[However, s]ince plaintiff's conviction remains valid, plaintiff's fair trial claim is not cognizable under [section] 1983, and it must be dismissed as to all defendants."); *Jovanovic v. City of N.Y.*, No. 04-CV-8437, 2006 WL 2411541, at *12 (S.D.N.Y. Aug. 17, 2006) (applying *Heck* to a section 1983 claim for denial of the right to a fair trial in the context of a statute of limitations issue), *mot. for reconsideration granted in part on other grounds*, 2008 WL 355515 (S.D.N.Y. Feb. 07, 2008).

### 2.      Standard

A section 1983 claim for the denial of a fair trial is, in essence, a claim for damages attributable to an unconstitutional conviction.  *See Heck*, 512 U.S. at 489–490.  The claim finds its roots in the Sixth Amendment, as well as the due process clauses of the Fifth and Fourteenth Amendments.  *See Holbrook v. Flynn*, 475 U.S. 560, 567 (1986) (recognizing that the Sixth and Fourteenth Amendments secure the constitutional right to a fair trial); *United States v. Ruiz*, 536 U.S. 622, 628 (2002) (recognizing that the Fifth and Sixth Amendments form "part of [the Constitution's] basic 'fair trial' guarantee").  The Fifth, Sixth and Fourteenth Amendments to the Constitution read:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law.

U.S. Const. amend. V.

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory

process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

U.S. Const. amend. VI.

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.

A denial of the right to a fair trial claim requires a plaintiff to prove that: "an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." *Jovanovic v. City of N.Y.*, 486 Fed. App'x 149, 152 (2d Cir. 2012) (citation omitted). *See also Reyes v. City of N.Y.*, 992 F. Supp. 2d 290, 297 (S.D.N.Y. 2014) (same). When a government official manufactures false evidence against an accused, and the use of that fabricated evidence results in the deprivation of the accused's liberty, the government official infringes the accused's constitutional right to a fair trial in a manner that is redressable in a section 1983 action for damages. *Zahrey v. Coffey*, 221 F.3d 342, 348–350 (2d Cir. 2000); *Ricciuti*, 124 F.3d at 130 (2d Cir. 1997) (holding that jury could find that defendants "violated the plaintiffs' clearly established constitutional rights by conspiring to fabricate and forward to prosecutors a known false confession almost certain to influence a jury's verdict"); *Alford v. City of N.Y.*, 11-CV-0622, 2012 WL 3764429, *4 (E.D.N.Y. Aug. 29, 2012) (holding that right to a fair trial is violated by "the creation of false evidence resulting in a denial of liberty" due to a "conviction and resulting sentence").

A right to a fair trial claim is distinct from a malicious prosecution claim. The Court of

Appeals for the Second Circuit explained:

> [E]ven where no Fourth Amendment violation occurred because there was probable cause to act (thereby rendering a malicious prosecution claim unavailable), an independent constitutional claim for the denial of the right to a fair trial can proceed under [section] 1983 based on allegations that a police officer fabricated evidence, if that fabrication caused a deprivation of the plaintiff's liberty. . . . A government official who falsifies evidence against an accused may be subject to liability . . . for violating the accused's Fifth, Sixth and Fourteenth Amendment right to a fair trial, and the existence of probable cause is irrelevant to the resolution of this claim. However, when a Fourth Amendment claim for malicious prosecution is alleged based on the same facts, the ultimate result will be that the existence of probable cause independent of the allegedly falsified evidence is a defense to that claim but not to the fair trial claim.
>
> . . .
>
> [T]he majority of [section] 1983 cases involving evidence fabrication arise from allegations that a police officer fabricated evidence and forwarded it to prosecutors *in order to provide probable cause* for an arrest or prosecution. In such cases, the question of whether the defendant fabricated evidence becomes synonymous with the question of whether genuine probable cause existed, and accordingly a plaintiff's malicious prosecution and fair trial claims would rise or fall together. Even in such cases, however, these remain distinct constitutional claims.

*Morse v. Spitzer*, No. 07-CV-4793, 2012 WL 3202963, at *5–6 (E.D.N.Y. Aug. 3, 2012)

(citations omitted) (emphasis in original). *See also Jovanovic*, 486 Fed. App'x at 152

(emphasizing that "[a]n element of any malicious prosecution claim is the absence of probable

cause" and that "[p]robable cause is not a defense" to a fair trial claim).

### D. Malicious Prosecution under Fourth Amendment and State Law

#### 1. Statute of Limitations

If success on a section 1983 claim would impugn the validity of an existing conviction,

the accrual date is delayed until the conviction is set aside. *Heck*, 512 U.S. at 486–487. A

malicious prosecution claim does not accrue until an underlying criminal proceeding terminates in plaintiff's favor. *Id.* at 489. The Court of Appeals for the Second Circuit recognizes that "'several United States Courts of Appeals have cited *Heck v. Humphrey* as authority for the proposition that [section] 1983 claims for malicious prosecution *do not accrue until their respective criminal prosecutions end in acquittal.*'" *Poventud v. City of N.Y.*, 750 F.3d 121, 131 (2d Cir. 2014) (emphasis added) (citation omitted). In *Poventud*, the Court of Appeals elaborated on *DiBlasio v. City of N.Y.,* 102 F.3d 654 (2d Cir. 1996), as follows:

> In *DiBlasio*—rightly decided and unaffected by our holding today—a panel of this Court addressed [the] claim of malicious prosecution. DiBlasio, convicted following a jury trial of criminal sale of cocaine and related charges, secured *vacatur* of his conviction through a *habeas* suit . . . that alleged that the state failed to produce or identify a confidential informant. On retrial, DiBlasio was convicted of only one of the lesser included offenses. He then sued under [section] 1983, "alleging malicious prosecution by the police officers." He contended that his conviction of a lesser offense was a favorable result that entitled him to damages for malicious prosecution on the more serious crimes. . . .
>
> . . . The Court, applying the malicious prosecution standard, "held that the criminal proceeding terminated when DiBlasio was convicted on the retrial. . . . The fact that the ultimate conviction was on a lesser count was irrelevant, because the charges arising out of the criminal transaction had to be brought together and as a whole "the State's case did not end in failure or in DiBlasio's favor." DiBlasio's [section] 1983 malicious prosecution claim was thus properly *Heck*-barred . . . because malicious prosecution under New York law requires "favorable termination of the proceedings" and a valid conviction on the lesser crime prevented the court from finding a "favorable termination." Either the outstanding conviction was invalid, or the elements of malicious prosecution were not met.

*Id.* at 131–132.

Where a prisoner-plaintiff brings a malicious prosecution claim on a charge for which she or he was acquitted, in order to determine if the claim may proceed, a court considers

whether the acquittal charge and the conviction charge are sufficiently distinct. *See Janetka v. Dabe*, 892 F.2d 187, 190 (2d Cir. 1989). To determine whether the charges are distinct, each should be examined separately. *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991). Charges may qualify as distinct even if they arose out of the same events occurring on the same occasion. *See id.* Courts examine several factors in determining whether charges are sufficiently distinct: (1) disparity in sentencing ranges; (2) the elements of each crime; and (3) whether the crimes were related or separate acts. *See, e.g.*, *Reid v. City of N.Y.*, No. 00-CV-5164, 2004 WL 626228, at *6–7 (S.D.N.Y. Mar. 29, 2004) (finding that the murder and reckless endangerment charges, the former of which plaintiff was acquitted, were sufficiently distinct in their elements, level of severity, and their targets, indicating plaintiff's malicious prosecution claim regarding the murder charge was not barred under *Heck* despite his conviction for reckless endangerment).

Where plaintiff's allegations attempt to undermine the legality of his or her entire prosecution, such that a challenge is to both the counts for which plaintiff was acquitted and for which he or she was convicted, a lawsuit will be barred by *Heck*. *Jackson v. Cnty. of Nassau*, No. 07-CV-245, 2010 WL 1849262, at *3 (E.D.N.Y. May 6, 2010) (citing cases); *Shaughnessy v. N.Y.*, 13-CV-271, 2014 WL 457947, at *5 (N.D.N.Y. Feb. 4, 2014) (same); *see also Zarro v. Spitzer*, 274 F. App'x 31, 34 (2d Cir. 2008) ("Counts 1 and 12 both rest on the alleged illegality of the entire investigation and prosecution of this case. Granting relief on either count would require finding that the prosecutor acted without legal authority, without probable cause, or in violation of [p]laintiff's constitutional rights. Such a finding would necessarily impugn the validity of [p]laintiff's conviction.").

## 2. Standard

A plaintiff who claims that a government official deprived him or her of the constitutional "right to be free of unreasonable seizure . . . —*i.e.*, . . . to be free of unreasonable or unwarranted restraints on personal liberty" by maliciously initiating criminal proceedings against him or her without probable cause invokes the protection of the Fourth Amendment." *Singer*, 63 F.3d 116. The elements of malicious prosecution under section 1983 are "substantially the same" as the elements under New York law; "the analysis of the state and the federal claims is identical." *Boyd v. City of N.Y.*, 336 F.3d 72, 75 (2d Cir. 2003). To state a malicious prosecution claim under New York law, the plaintiff must establish: (1) the initiation of a criminal proceeding; (2) its termination favorably to plaintiff; (3) lack of probable cause; and (4) malice. *Manganiello v. City of N.Y.*, 612 F.3d 149, 161 (2d Cir. 2010). Under section 1983, the plaintiff must establish an additional element: a post-arraignment deprivation of liberty that rises to the level of a constitutional violation. *Boley v. Durets*, No. 12-CV-4090, 2013 WL 6562445, at *5 (E.D.N.Y. Dec. 10, 2013).

### a. Initiation

To establish the first element of malicious prosecution, a plaintiff must show that the defendant "'play[ed] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'" *Manganiello*, 612 F.3d at 163 (citation omitted). *See also Cameron v. City of N.Y.*, 598 F.3d 50, 63 (2d Cir. 2010) ("Under New York law, police officers can 'initiate' prosecution by filing charges or other accusatory instruments."); *Tretola v. D'Amico*, No. 13-CV-5705, 2014 WL 2957523, at *7 (E.D.N.Y. July 1, 2014) ("In malicious prosecution cases against police officers, plaintiffs have met this first element by showing that officers brought formal charges and had the person arraigned, or filled out complaining and corroborating affidavits, or swore to and signed a felony complaint.").

"'[W]here allegation of misconduct is directed at police, a malicious-prosecution claim cannot stand if the decision made by the prosecutor to bring criminal charges was independent of any pressure exerted by police.'" *Hartman v. Moore*, 547 U.S. 250, 263 (2006) (citation omitted).  A successful claim against a police officer "requires some showing that the defendant distorted the process by which plaintiff was brought to trial, and an officer who does no more than disclose to a prosecutor all material information within his knowledge is not deemed to be the initiator of the proceeding." *Breeden v. City of N.Y.*, No. 09-CV-4995, 2014 WL 173249, at *10 (E.D.N.Y. Jan. 13, 2014) (internal quotation marks and citation omitted).

In cases against police officers, "plaintiffs have overcome the presumption that a prosecutor exercises independent judgment in deciding whether to initiate a criminal proceeding where they have shown that the officer either (1) created false information and forwarded it to prosecutors or (2) withheld relevant and material information." *Id.*  Showing that the police "failed to make a complete and full statement of facts to the District Attorney, misrepresented or falsified evidence, withheld evidence or otherwise acted in bad faith" satisfies the initiation element of malicious prosecution. *Manganiello*, 612 F.3d at 160.  *See also Blake v. Race*, 487 F. Supp. 2d 187, 211 (E.D.N.Y. 2007) (finding initiation element met where defendant officers "allegedly fed the facts to [a police informant], thereby providing the unknowing D[istrict] A[ttorney] with what may be considered a fabricated eyewitness, who made the line-up identification and provided testimony"); *Zahrey*, 221 F.3d at 352 ("Even if the intervening decision-maker (such as a prosecutor, grand jury, or judge) is not misled or coerced, it is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an "independent" decision that results in a deprivation of liberty.").

In *Ricciuti*, the Court of Appeals for the Second Circuit described the following

scenario:

> Here, . . . a jury could clearly find that [the police officer] started
> the . . . prosecution because no one disputes that he . . . fil[ed] the
> charge[]. A jury could also find that [he] was instrumental in
> bringing about the [other] charges [brought by the prosecutor].
> Although these [additional] charges were added by the Bronx
> district attorney's office, and thus not directly filed by [the officer],
> a jury could find that [the officer] played a role in initiating the
> prosecution by preparing the alleged false confession and
> forwarding it to prosecutors.

*Ricciuti*, 124 F.3d at 130 (reversing grant of summary judgment on section 1983 malicious

prosecution claim).

### b. Probable Cause

The existence of probable cause is a defense to a claim of malicious prosecution. *See*

*Savino v. City of N.Y.*, 331 F.3d 63, 72 (2d Cir. 2003). Probable cause to prosecute exists when

there are "such facts and circumstances as would lead a reasonably prudent person to believe the

plaintiff is guilty." *Boyd*, 336 F.3d at 76. The inquiry considers whether defendant "believe[d]

that the plaintiff could be 'successfully prosecuted.'" *Stone v. Port Auth. of N.Y. & N.J.*, No.

11-CV-3932, 2014 WL 3110002, at *9 (E.D.N.Y. July 8, 2014) (quoting *Posr v. Court Officer

Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999)). Probable cause to arrest "is a defense to a

claim of malicious prosecution if it is not later nullified by information establishing the

accused's innocence." *Id.* (quoting *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014)).

"[I]ndictment by a grand jury creates a presumption of probable cause that may *only* be

rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of

evidence or other police conduct undertaken in bad faith." *Savino*, 331 F.3d at 72 (emphasis in

original) (internal quotation marks and citation omitted). The law "requires the plaintiff to

establish what occurred in the grand jury, and to further establish that those circumstances

warrant a finding of misconduct sufficient to erode the premise that the Grand Jury acts judicially." *Rothstein v. Carriere*, 373 F.3d 275, 284 (2d Cir. 2004) (internal quotation marks and citation omitted).

Plaintiff cannot satisfy this burden "with mere 'conjecture' and 'surmise' that [the] indictment was procured as a result of conduct undertaken by the defendants in bad faith." *Savino*, 331 F.3d at 73 (citation omitted); *see also Brandon v. City of N.Y.*, 705 F. Supp. 2d 261, 273 (S.D.N.Y. 2010) (same (citing cases)); *Richardson v. City of N.Y.*, 2006 WL 2792768, at *7 n. 4 (E.D.N.Y. Sept. 27, 2006) (denying summary judgment, noting that regarding a malicious prosecution claim, "the alleged fabrication must be both material, *i.e.*, 'likely to influence a jury's decision,' and 'the legally cognizable' cause of the post-arraignment deprivation of liberty" (quoting *Ricciuti*, 124 F.3d at 130; *Zahrey*, 221 F.3d at 350)); *see also Felmine v. City of N.Y.*, No. 09-CV-3768, 2011 WL 4543268, at *12 (finding that to rebut presumption of probable cause created by grand jury indictment, misconduct by police must be "proximate cause" of indictment).

"[I]t would be objectively unreasonable for [an officer] to believe he had probable cause to arrest [plaintiff] if [the officer] himself fabricated the grounds for arrest." *Scotto v. Almenas*, 143 F.3d 105, 113 (2d Cir. 1998). *See also*, *e.g.*, *Brandon,* 705 F. Supp. 2d at 274 (S.D.N.Y. 2010) (denying summary judgment with respect to malicious prosecution claim because jury could reasonably find that indictment was secured through bad faith or perjury); *cf. Bouche v. City of Mt. Vernon*, No. 11 Civ. 5246, 2012 WL 987592, at *7 (S.D.N.Y. Mar. 23, 2012) (denying motion to dismiss with respect to malicious prosecution claim because plaintiff adequately "alleged that the police department acted in bad faith in improperly creating and then using unreliable eyewitness identifications").

### c. Malice

Malice requires a showing by plaintiff that defendants had "a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (remanding grant of summary judgment with respect to one of two malicious prosecution claims). Malice is generally inferred from circumstantial evidence. *Id.*

The absence of probable cause "raises an inference of malice sufficient for a claim of malicious prosecution to withstand summary judgment." *Ricciuti*, 124 F.3d at 131. Falsifying evidence is sufficient to show malice. *Blake*, 487 F. Supp. 2d at 212 ("[Plaintiff] not only proffers circumstantial evidence of malice due to an alleged lack of probable cause, but also argues malice through direct evidence from [police informant] that one or more of the defendants engaged in intentional misconduct by pressuring [informant] to implicate [plaintiff], . . . feeding [informant] details of the homicides, even though [defendants] did not believe in [plaintiff's] guilt. Under such circumstances, there is an issue of fact on the element of malice."); *see also Chimurenga v. City of N.Y.*, 45 F. Supp. 2d 337, 343–344 (S.D.N.Y. 1999) (finding that fact questions regarding probable cause and, by extension, malice precluded summary judgment for correction officers on malicious prosecution claims); *accord Sanders v. English*, 950 F.2d 1152, 1163 (5th Cir. 1992) ("'[M]aliciously tendering false information,' can . . . form the basis for an inference that a defendant police officer acted with malice in initiating and maintaining a prosecution." (citation omitted)).

### E.    State Law *Respondeat Superior*

#### 1.    Statute of Limitations

A state law claim for malicious prosecution, like a federal claim, accrues on the date the criminal proceeding in question terminated in plaintiff's favor. *See Ragland v. City of N.Y.*, 45

Misc. 3d 1218(A), at *2 (N.Y. Sup. Ct. 2014); *Bumbury v. City of N.Y.*, 880 N.Y.S.2d 44, 45 (App. Div. [1st Dep't] 2009) (same). "'Any termination of a criminal prosecution, such that the criminal charges may not be brought again, qualifies as a favorable termination, so long as the circumstances surrounding the termination are not inconsistent with the innocence of the accused.'" *Bellissimo v. Mitchell*, 995 N.Y.S.2d 603, 606 (App. Div. [2d Dep't] 2014) (citation omitted). New York state courts adhere to the dictates of *Heck*. *See Britt v. Legal Aid Soc., Inc.*, 95 N.Y.S.2d 443, 448 (2000); *accord supra* Part IV.D.1 (discussing when malicious prosecutions claims are barred and not barred by *Heck*).

### 2.    Standard

New York courts have held municipalities liable under a theory of *respondeat superior* for malicious prosecution. *Sankar v. City of N.Y.*, 867 F. Supp. 2d 297, 313 (E.D.N.Y. 2012) ("Unlike claims brought pursuant to [s]ection 1983, under New York state law, municipalities may be held vicariously liable for . . . malicious prosecution under a theory of *respondeat superior*. This applies even to discretionary actions by police officers where . . . genuine issues of material fact exist as to whether there was probable cause for arrest." (citations omitted)); *cf. Graham v. City of N.Y.*, 928 F. Supp. 2d 610, 626 (E.D.N.Y. 2013) (finding that because plaintiff sustained false arrest and assault and battery claims against officer defendants, plaintiff's false arrest and assault and battery claims against defendant New York City survived summary judgment under state law theory of *respondeat superior*).

### F.    Qualified Immunity

Qualified immunity protects federal and state officials from money damages and "unnecessary and burdensome discovery or trial proceedings." *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (quoting *Crawford–El v. Britton*, 523 U.S. 574, 598 (1998)). "This

policy is justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *Thomas*, 165 F.3d at 142 (quoting *Anderson v. Creighton,* 483 U.S. 635, 638 (1987)).

It is an affirmative defense that defendants have the burden of establishing on a motion for summary judgment. *Id.* A decision dismissing a claim based on qualified immunity at this stage may "only be granted when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011)). The Court of Appeals for the Second Circuit has explained:

> [Courts] have discretion to decide which of the two prongs of [the] qualified-immunity analysis to tackle first. Deciding a case under prong two saves scarce judicial resources by avoiding unnecessary decisions whether certain conduct violates a constitutional or statutory right, when it is beyond reproach that *the conduct was not objectively unreasonable in light of existing law*.

*Id.* at 219–220 (emphasis added).

Officers are entitled to qualified immunity if "officers of reasonable competence could disagree" as to the legality of their action. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). A claim that it was objectively reasonable for an official to believe that his actions did not violate a clearly established right "has its principal focus on the particular facts of the case." *Hurlman v. Rice*, 927 F.2d 74, 78 (2d Cir. 1991). A "'government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Coollick*, 699 F.3d at 220 (quoting *Ashcroft*, 131 S.Ct. at 2083). A police officer has acted in an objectively unreasonable manner "'when no officer of reasonable

competence could have made the same choice in similar circumstances.'" *Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir. 1997) (citation omitted). Summary judgment can only be granted on the basis of qualified immunity if the defendant can show that "no reasonable jury, viewing the evidence in the light most favorable to the [p]laintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *Ford v. Moore*, 237 F.3d 156, 162 (2d Cir. 2001).

Where there is no dispute as to the material facts, the matter of whether defendants' conduct was objectively reasonable is a question of law for the court. *See*, *e.g.*, *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007). If there is such a factual dispute, "'the factual questions must be resolved by the factfinder.'" *Id.* (citation omitted); *see also Thomas*, 165 at143 ("Summary judgment on qualified immunity grounds is not appropriate where there are facts in dispute that are material to a determination of reasonableness."); *Felmine*, 2011 WL 4543268, at *10 (finding defendant officers were not entitled to qualified immunity on false arrest claim because, reading the disputed evidence in the light most favorable to plaintiff, it was not objectively reasonable to arrest plaintiff for simply being present at the chaotic fight scene); *Ricciuti*, 124 F.3d at 128–130 (affirming grant of summary judgment to defendants on qualified immunity grounds with respect to false arrest claim while simultaneously holding that same defendants were not entitled to qualified immunity on claim that they fabricated evidence against plaintiffs); *Henry v. City of N.Y.*, No. 02-CV-4824, 2003 WL 22077469, at *4 (S.D.N.Y. Sept. 28, 2003) (applying *Zahrey* to hold that qualified immunity would be unavailable on fair trial claim if "deprivation of liberty was a result of . . . planted evidence").

### G. Notice of Claim Requirement under General Municipal Law

Under New York law, "[n]o action . . . shall be prosecuted or maintained against the city . . . or any employee unless notice of claim shall have been made and served upon the city in compliance with section fifty-e of this chapter." N.Y. Gen. Mun. L. § 50–k(6). General Municipal Law section 50–e provides:

> The notice shall be in writing, sworn to by or on behalf of the claimant, and shall set forth: (1) the name and post-office address of each claimant, and of his attorney, if any; (2) the nature of the claim; (3) the time when, the place where and the manner in which the claim arose; and (4) the items of damage or injuries claimed to have been sustained so far as then practicable.

N.Y. Gen. Mun. L. § 50–e.

The New York Court of Appeals has yet to resolve a split among the intermediate appellate courts on how rigidly to apply the dictates of General Municipal Law section 50-e. *Reyes*, 992 F. Supp. 2d at 301 (discussing split between Fourth Department and First Department). The Fourth Department has held that a plaintiff need not name each individual defendant in a notice of claim. *Goodwin v. Pretorius,* 962 N.Y.S.2d 539, 545 (App. Div. [4th Dep't] 2013) ("[C]ourts have misapplied or misunderstood the law in creating, by judicial fiat, a requirement for notices of claim that goes beyond those requirements set forth in the statute. If the legislature had intended that there be a requirement that the individual employees be named in the notices of claim, it could easily have created such a requirement."). The First Department disagrees. *Cleghorne v. City of N.Y.,* 952 N.Y.S.2d 114, 117 (App. Div. [1st Dep't] 2012) ("[T]he action cannot proceed against the individual defendants because they were not named in the notice of claim.").

"'When the highest state court has not ruled directly on [an] issue presented, a federal court must make its best estimate as to how the state's highest court would rule in the case.'"

*Id.* (citing cases). The *Reyes* court concluded that it predicts that, for the same reasons articulated in *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 397–398 (S.D.N.Y. Dec. 10, 2013), the New York Court of Appeals will likely adopt the Fourth Department's reasoning because the leading opinion "thoroughly examines the doctrinal developments regarding the [notice] requirement." *Id.* at 302 (allowing plaintiff's state law claims against multiple defendants to proceed despite fact that plaintiff only named one defendant in his notice of claim). *See also Chamberlain*, 986 F. Supp. 2d at 398 ("In the absence of more specific guidance, I adopt the [Fourth Department's] well-reasoned conclusion that there is no requirement that individual defendants be specifically named in the [n]otice of [c]laim.").

## VI.     Application of Facts to Law

### A.     Municipal Liability

It is anomalous that under *Monell* and New York law, while the City has no control over what happens in the District Attorney's office respecting prosecutions, it must pay the bill if the prosecutor violates *Monell*. *See supra* Part V.A.1 (discussing *Jones*, 988 F. Supp. 2d 305). Even if the District Attorney's office had a pattern or practice of disclosing *Brady* material at the eleventh hour, or allowed such a pattern or practice to develop knowingly, it is unfair and a "Catch-22" situation for the City to be held liable. *See generally Jones*, 988 F. Supp. 2d 305.

Given the materials submitted by plaintiff suggesting a possible pattern and practice by the District Attorney of Kings County in violation of the Constitution, the *Monell* issue cannot be swept under the rug. *See supra* Parts II.J & V; *Collins*, 923 F. Supp. 2d at 478 ("The Court concludes that [the] allegations regarding Hynes's response—or lack thereof—to misconduct . . . and other assistants make plausible [the] theory that Hynes was so deliberately indifferent to

the underhanded tactics that his subordinates employed as to effectively encourage them to do so.").

The fact that a new district attorney has been elected by voters, while possibly of political significance, does not bear on the constitutional issue central to this case. *Cf. FCC v. Bench Commc'ns, Inc.*, 508 U.S. 307, 314 (1993) ("The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted." (internal quotation marks and citation omitted)); *Orr v. Orr*, 440 U.S. 268, 290 (1979) ("The architects of our constitutional form of government, to assure that courts exercising the 'judicial power of the United States' would not trench upon the authority committed to the other branches of government, consciously limited the Judicial Branch's 'right of expounding the Constitution' to 'cases of a Judiciary Nature'—that is, to actual 'cases' and 'controversies' between genuinely adverse parties." (citation omitted)); *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J. concurring) ("We should be ever mindful of the contradictions that would arise if a democracy were to permit general oversight of the elected branches of government by a nonrepresentative, and in large measure insulated, judicial branch."). It is the pattern and practice at the time before the election of a new district attorney of Kings County when events relevant to the present cases were taking place that controls.

While discovery on the *Monell* claim is still pending, defendants' motion for summary judgment regarding plaintiff's municipal liability claim is denied.

### B. False Arrest

Time to bring Bailey's false arrest claim has run. *See supra* Part V.B.1. Plaintiff concedes that the statute of limitations applicable to Bailey's false arrest claim accrued when

Bailey was arraigned in July 2007. (Pl.'s Opp. to Defs.' Mot. to Dismiss 5 n.3, ECF No. 19.) The three year statute of limitation ended in July 2010, approximately four years from the date on which this action was filed—April 2, 2014.

Defendants' motion for summary judgment regarding plaintiff's false arrest claim is granted.

### C.    Right to a Fair Trial

#### 1.    Accrual Date

Defendants erroneously contend that plaintiff's unfair trial claim based upon fabrication of evidence is time barred. They assert that because favorable termination is not a prerequisite to the commencement of a fair trial claim, the claim accrued either (1) on January 29, 2009, the date Bailey became aware of Villanueva's contention that police had coerced him to identify Bailey; or (2) on February 5, 2009, the date the jury returned a verdict convicting Bailey of the attempted murder of Villanueva. (Defs.' Mot. Summ. J. Mem. 23–24, ECF No. 61.)

Where a plaintiff's right to a fair trial claim would necessarily impugn the validity of his conviction, "the complaint must be dismissed unless [he] can demonstrate that the conviction or sentence has already been invalidated." *Heck*, 512 U.S. 477 at 487. Had Bailey raised his fair trial claim—premised on the fabrication of evidence, which resulted in his arrest and subsequent conviction—prior to the date his conviction was invalidated, his complaint would have been dismissed because it would have necessarily implied the unlawfulness of his conviction. *See supra* Part.V.C.1

The three-year section 1983 statute of limitations on plaintiff's fair trial claim did not accrue until January 9, 2013—the date the Second Department overturned Bailey's conviction. *See supra* Part II.H.

41

Plaintiff filed this action on April 2, 2014. His right to a fair trial claim is timely.

### 2. Merits

Reading the disputed facts in the light most favorable to plaintiff, Bailey has sufficiently alleged that defendant officers improperly influenced and coerced an eyewitness identification from Villanueva and grand jury testimony from him, resulting in Bailey's indictment, trial, and conviction of attempted murder. *See supra* Parts II & V.C.2. Not only has Bailey provided concrete evidence that Villanueva waivered with respect to his testimony at Bailey's criminal trial, Villanueva has since recanted his identification of Bailey as the man who attempted to shoot him. *See* Part II. D, F & I.

It is not within the purview of the trial court at this stage of the litigation to make a credibility assessment regarding Villanueva's recantation. *See supra* Part III. If a jury finds Villanueva's recantation credible, it could find that defendants violated Bailey's right to a fair trial by fabricating evidence and forwarding it to prosecutors. *See supra* Part V.C.2.

The right to a fair trial is violated by the creation of false evidence by an investigating official resulting in a conviction, which Bailey allegedly suffered. *Id*.; *see also Morse*, 2012 WL 3202963, at *6 (finding that, in cases where officers forwarded fabricated evidence to prosecutors in order to provide probable cause for prosecution, "the question of whether the defendant fabricated evidence becomes synonymous with the question of whether genuine probable cause existed, and accordingly a plaintiff's malicious prosecution and fair trial claims w[ill] rise or fall together"); *see infra* at Part VI.D.2 (finding that questions of material fact exist regarding whether probable cause existed for Bailey's arrest).

Defendants' motion for summary judgment on plaintiff's right to a fair trial claim is denied.

### D. Malicious Prosecution under Federal and State Law

#### 1. Accrual Date

Plaintiff's malicious prosecution claim is not time barred. Under *Heck,* Bailey's malicious prosecution claim accrued on January 9, 2013, the date the Appellate Division reversed his attempted murder conviction. *See supra* Part II.H. Although it is true that where "criminal charges are resolved at different times, there must be a separate analysis of each charge that was criminally prosecuted," *Posr*, 944 F.2d at 100, in the instant case, defendants incorrectly assert that the claim accrued on the date the Ruiz murder charge and the charge for possession of a handgun were dismissed. (*See* Defs.' Mot. Summ. J. Mem. 8.)

Here, plaintiff's allegations undermine the legality of his entire prosecution—including whether there was probable cause to arrest him in the first instance; the case is not strictly limited to the legality of the murder charge. *Jackson*, 2010 WL 1849262, at \*3 (finding that where plaintiff's allegations attempt to undermine the legality of the entire prosecution, so that a challenge is to both the counts for which plaintiff was acquitted and for which he or she was convicted, a lawsuit will be barred by *Heck* if plaintiff was convicted on at least some of the counts with which he was charged (citing cases)). Had Bailey brought his malicious prosecution claim on February 5, 2009, when he was acquitted of the murder of Ruiz, his claim as pled would have been barred by *Heck*. *See supra* Part V.D.1.

Plaintiff filed this action on April 2, 2014. Bailey's malicious prosecution claim is timely.

#### 2. Merits

Bailey's allegations and proof to date satisfy the elements of malicious prosecution. *See supra* Part V.D.2 & E.2.

*First*, defendant detectives initiated a criminal proceeding. *See supra* Part IV.D.2.a. Unavailing is the argument that Bailey cannot satisfy this element because the defendant officers' alleged coercion of testimony was for the sole purpose of securing an arrest for the murder of Ruiz and criminal possession of a weapon, not for the attempted murder of Villanueva, which was only raised during grand jury proceedings after the case had left the hands of defendant detectives. (*See* Defs.' Mot. Summ. J. Mem. 10.)

Police officers who coerce testimony for a more serious charge that does not result in conviction cannot be shielded from liability for malicious prosecution on lesser offenses brought by prosecutors related to the allegedly coerced testimony for which a conviction was secured. *Ricciuti*, 124 F.3d at 130 ("[A]lthough . . . charges were added by [the prosecutor], a jury could find that [the officer] played a role initiating the prosecution by preparing the alleged false confession and forwarding it to prosecutors."); *cf. Posr*, 944 F.2d at 100 ("[A]n officer with probable cause as to a lesser offense [cannot] tack on more serious, unfounded charges which would support a high bail or a lengthy detention, knowing that the probable cause on the lesser offense would insulate him from liability for malicious prosecution on the other offenses.").

In the instant action, the testimony of Villanueva and Griffin, used to secure the warrant for Bailey's arrest for the murder or Ruiz, linked the man with the handgun used to shoot Ruiz to the man who attempted to kill Villanueva. *See supra* Part II. ADA Jackson relied on this theory in front of the grand jury, which indicted Bailey for Ruiz's murder, the attempted murder of Villanueva, and illegal possession of a handgun. *Id.* Although Jackson added the attempted murder charge, a jury could find that the defendant detectives played a role in initiating the prosecution by allegedly fabricating evidence.

*Second*, Bailey's criminal proceeding terminated in his favor on January 9, 2013, when the Appellate Division reversed his conviction. *See supra* Part II.H.

*Third*, there are questions of material fact regarding whether probable cause for the criminal charges brought against Bailey was lacking. *See supra* Part V.D.2.b. Defendants' alleged coercion of Villanueva and Griffin serves to rebut the presumption of probable cause associated with the grand jury indictment. *Id*. Defendants' argument that Villanueva's recent allegations of coercion should be disregarded under *Jeffreys*, 275 F. Supp. 2d 463 (S.D.N.Y. 2003), is dubious. (*See* Defs.' Mot. Summ. J. Mem. 16–17.) *Jeffreys* is inapposite. In effect, Jeffreys was not a credible witness as a matter of law. As the Court of Appeals for the Second Circuit explained:

> In *Jeffreys*, . . . [t]he plaintiff, Percy Jeffreys, brought suit against several police officers who allegedly assaulted him with a flashlight before throwing him out of a third-story window. Jeffreys's account of the incident at his deposition differed on all points from several accounts that Jeffreys gave shortly after the incident happened. On at least three occasions Jeffreys "confessed to having jumped out of the third-story window," and made "no mention of any police misconduct." Similarly, "at his arraignment, guilty plea, and sentencing, Jeffreys made no mention of any beating or defenestration," and medical records also appeared to belie his claim. During his deposition testimony, moreover, Jeffreys was unable to provide any specific details about the incident, and the testimony was corroborated only by two family members who submitted affidavits that established, at best, what Jeffreys had told them about the incident sometime after it occurred. [Granting summary judgment,] [w]e concluded that . . . even after drawing all inferences in the light most favorable to the plaintiff, . . . no reasonable person could believe Jeffreys's testimony.

*Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 22–23 (2d Cir. 2014) (citations omitted) (holding that plaintiff's claim cannot be analogized to the "real, unequivocal, and inescapable contradiction of the sort we contemplated in *Jeffreys*").

Here, by contrast, Bailey relies on evidence a jury could find credible. In addition to his own testimony, and an overturned criminal conviction, Bailey puts forward contemporary deposition testimony of a recanting witness who already stated once in 2009 that police officers coerced him into identifying Bailey as the man who attempted to shoot him. The fact that this issue was raised in 2009 during Bailey's criminal trial (albeit the fact that the criminal court judge at the time ruled Villanueva's testimony admissible), coupled with the fact that it is being raised again in 2014, requires a credibility assessment that is within the province of a jury to make at trial; it is not for the court to make on a motion for summary judgment. *See supra* Part III. Defendants' point that the Appellate Division decision overturning Bailey's attempted murder conviction noted that the reversal was not "based not on any doubt that the complainant was testifying truthfully" cannot be read as a determinative finding by the court that Villanueva's testimony was not coerced. (*See* Defs.' Mot. Summ. J. Reply Mem. 4–5, ECF No. 68.) *See supra* Part II.H (discussing Appellate Division opinion).

*Fourth*, because the probable cause for plaintiff's arrest has been put into question by Villanueva's recantation of his trial testimony, Bailey has raised an inference of malice, which is sufficient for a claim of malicious prosecution to withstand summary judgment. *See supra* Part V.D.2.c.

*Fifth*, plaintiff's four-year incarceration rises to the level of a post-arraignment deprivation of liberty—a constitutional violation. *See supra* Part V.D.

Bailey has satisfied both federal and state law requirements for a malicious prosecution claim against officer defendants and the City of New York. *See supra* Part V.D & E. No defendant officer is entitled to qualified immunity when alleged fabrication of evidence is key to the case. *See supra* Part V.F. It is irrelevant that plaintiff's notice of claim identifies only the

City of New York as a respondent to his state law malicious prosecution claim. *See supra* Part V.G.

Defendants' motion for summary judgment regarding plaintiff's malicious prosecution claim is denied.

## VII.    Conclusion

Defendants' motion for summary judgment regarding plaintiff's false arrest claim is granted. It is denied with respect to plaintiff's *Monell*, fair trial, and federal and state malicious prosecution claims.

John Does 1-10 are dismissed. No evidence was marshalled respecting their involvement.

*In limine* motions will be heard on April 13, 2015 at 10:00 a.m.

By April 6, 2015, the parties shall submit to the court proposed jury charges and verdict sheets, *in limine* motions, and any supporting briefs. They shall also exchange and file with the court: (1) lists of pre-marked exhibits proposed for use at trial, together with copies of all exhibits; (2) lists of potential witnesses together with brief summaries of proposed testimony; and (3) stipulations with respect to all undisputed facts.

Trial will be held on April 20, 2015 at 2:00 p.m. A jury will be selected before a magistrate judge.

Any disputes related to briefing schedules or discovery are respectfully referred to the magistrate judge.

SO ORDERED.

_____
Jack B. Weinstein
Senior United States District Judge

Date:   January 15, 2015
        Brooklyn, New York